**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CAMARILLO HOSPITALITY LLC, et al., | Case No. 1:26-cv-01906 JLT CDB |
| Plaintiffs, | ORDER RE REQUEST FOR AN ORDER TO SHOW CAUSE (Doc. 6) |
| v. | ORDER TO SHOW CAUSE RE CONTEMPT |
| G6 HOSPITALITY LLC, et al., | |
| Defendants. | |

## I.      INTRODUCTION

Plaintiffs, Motel 6 and Studio 6 franchise operators in California, bring numerous state law claims against franchisor Defendants. The operative First Amended Complaint (FAC), (*see* Doc. 1-2 at 9–37), alleges, among other things, that there is a significant, ongoing dispute between the parties over the amount owed by Plaintiffs to Defendant G6 Hospitality, LLC, under their franchise agreements. (FAC, ¶ 25.) According to Plaintiffs, the parties engaged in good-faith discussions to resolve any contractual dispute and reached a verbal agreement to address outstanding payment issues, which was confirmed by performance. (*Id*., ¶¶ 26–27.) However, Plaintiffs allege that starting in late December 2025, G6 began threatening to and then did engage in coercive business practices, including resorting to a "self-help" mechanism to withhold moneys that should flow to Plaintiffs via various booking platforms by processing those payments through a service called "Brand Collect." (*Id*., ¶ 46; *see also* Doc. 4 (describing Brand Collect as

1

a "service that certain companies, like Booking.com and other online travel agents [ ] provide to their users to assure that bills are paid").)

Defendant G6 Hospitality LLC removed this action from Kern County Superior Court on March 6, 2026 (Doc. 1), one day after that court issued a temporary restraining order requiring Defendant to release more than $1,000,000 in funds to Plaintiffs that Defendant is withholding under the allegedly unlawful "self-help" mechanism—a mechanism the state court described as "manifestly unlawful under California law," even if the parties' franchise agreement permits such withholdings. (*See* Doc. 4 at 23, hereinafter "TRO Tr." at p. 5.) In addition, the state court ordered Defendant to restore Plaintiffs' access to essential booking and reservation management platforms. (*Id*. at 16.) The TRO required Defendant's compliance by March 10, 2026, and the payment by Plaintiffs of a $250,000 undertaking two days later. (*See* Doc. 4.)

Instead of complying with the TRO or seeking relief prior to the compliance deadline, Defendant waited until March 13, 2026 to file an emergency motion to dissolve the TRO. (Doc. 3.) On March 16, 2026, Defendant amended that motion. (Doc. 4.) That same day, Plaintiffs filed an opposition to the motion to dissolve (Doc. 5) and a motion to enforce judgment and a request that this Court issue an order to show cause re contempt. (Doc. 6.) On March 17, 2026, Plaintiffs filed a supplemental opposition to the amended motion to dissolve. (Doc. 9.)

On March 18, 2026, the Court denied the Defense motion to dissolve, finding, among other things: (1) the state court had given Defendant numerous opportunities to explain its positions, the facts, and the extensive record at the TRO hearing (Doc. 10 at 3–4); (2) no other changed circumstance warranted dissolving the TRO (*id*. at 4); (3) the state court properly evaluated the *Winter* factors before imposing the injunction (*id*. at 4-6); the relief ordered was not an improper mandatory injunction (*id*. at 7); the timing and amount of the required bond was appropriate (*id*. at 8); and the parties agreed to allow the TRO to remain in place for 60 days (*id*. at 8–9). The March 18, 2026 Order also reduced the state courts' TRO order to writing, directing Defendant "immediately comply with all provisions of the State Court TRO."

Remaining before the Court for decision is Plaintiffs' motion to enforce and for an order to show cause re: contempt, which asserts that Defendant has not complied with various

2

provisions in the TRO. (Doc. 6.) For the reasons set forth below, the motion is **GRANTED IN PART**.

## II.     LEGAL STANDARD

A party that prevailed in securing a court order may seek to hold the opposing party in civil contempt for the party's failure to comply with that order. *See Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). "Civil contempt sanctions . . . are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04, (1947)). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." *Id.* (internal citations omitted).

To establish a civil contempt claim, the petitioner must show "(1) that [the opposing party] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010) (internal quotations omitted). If the petitioner satisfies that burden, the respondent bears the burden of "demonstrating that they were unable to comply" and to articulate reasons why compliance was not possible. *See Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983)(to satisfy this responsive burden the party must show "categorically and in detail" why they were unable to comply with the court's previous order). The respondent must have performed "'all reasonable steps within [its] power to insure compliance' with the court's order." *Stone v. City and Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)). The Court may consider the respondent's history of noncompliance when evaluating the proffered reasons why compliance was not possible. *Id.* at 857.

A petitioner for civil contempt must typically initiate a civil contempt claim by requesting an order to show cause. *See K.M. v. Tehachapi Unified Sch. Dist.*, No. 1:17-CV-01431-LJO-JLT, 2020 WL 6145113, at *10 (E.D. Cal. Oct. 20, 2020), *report and recommendation adopted*, 2021

WL 1291958 (E.D. Cal. Apr. 7, 2021). In assessing whether sufficient grounds for contempt exist, courts evaluate the request to show cause based on the underlying standards applicable to the merits of a civil contempt claim. *See Eaconomy, LLC v. Auvoria Prime, LLC*, 482 F. Supp. 3d 1030, 1037 (E.D. Cal. 2020) (denying request for order to show cause because the petitioner "failed to justify civil contempt by clear and convincing evidence"); *HSBC Bank USA v. Dara Petroleum, Inc.*, No. 2:09-CV-2356-WBS-EFB, 2016 WL 2853584, at *2 (E.D. Cal. May 16, 2016). "The procedure for civil contempt is to set an order to show cause hearing and to provide the contemnor an opportunity to respond and/or comply with the order." *Swansea Inv. Grp., Inc. v. ResMac, Inc.*, No. CV 19-9319-GW-JPRX, 2021 WL 8316884, at *3 (C.D. Cal. Feb. 11, 2021) (internal quotation and citation omitted). The Court must hold an evidentiary hearing on the merits of the civil contempt claim unless uncontroverted affidavits support finding the respondent in contempt. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998).

## III.   DISCUSSION

Plaintiffs' initial motion to enforce, filed March 16, 2026, asserted that Defendant had failed to comply with the TRO in numerous ways. (Doc. 6 at 12; *see also* Doc. 6-1 (March 16, 2026 Declaration of Jagesh Patel).) On March 23, 2026, Defendant filed an opposition to the motion to enforce supported by the March 20, 2026 Declaration of Anuj Ladha. (Doc. 13-1 at 32; *see also* Doc. 11.) On March 25, 2026, following its denial of the motion to dissolve, this Court entered the following order, directing the parties to meet and confer:

> The Court has reviewed preliminarily the papers filed in relation to the pending motion to enforce and for an order to show cause re contempt. (Doc. 6.) This Court, one of the busiest in the nation, cannot and will not micromanage a business relationship and will address on an emergency basis only issues that are absolutely necessary to avoid irreparable harm. Thus, the parties SHALL meet and confer in person or via video conference within four days of the date of this Minute Order in a good faith effort to narrow the remaining disputes. Within seven days thereafter, Plaintiffs SHALL file a declaration outlining in detail the results of that meet and confer effort and may file a supplemental reply brief highlighting any remaining disputes related to their motion to enforce.

(Doc. 16.)

The result was anything but helpful. On April 6, 2026, Plaintiffs filed a supplemental

4

"reply" that described in detail how the parties met and conferred on several occasions, none of which were productive. (Doc. 18.) Plaintiffs assert that Defendant made various admissions during the meet and confer sessions that, according to Plaintiffs, further justify the issuance of an order to show cause. (*Id*.) The trouble is that Plaintiffs' arguments are based, in large part, on material taken from "transcripts" of the meet and confer conferences (Doc. 18-2) that appear to have been automatically generated by an Artificial Intelligence tool associated with the video conference software (Microsoft Teams) utilized by the parties. (*See* Doc. 21-1.)

Upon learning that Plaintiffs had attached these "transcripts" to the reply brief, Defense counsel promptly filed an objection, arguing that the Defense was "completely unaware that it was being recorded until after the meeting ended and an email permitting a download of the transcript was provided." (Doc. 19 at 4.) Defense counsel maintains that he did not consent to this recording and suggests that the transcription of the meeting violated California law. (*Id*.)

In an abundance of caution, the Court immediately sealed the "transcripts" and allowed Plaintiffs to respond. (Doc. 20.) In that response, Plaintiffs' counsel indicates that he too received an email after the first conference on March 30, 2026 indicating that a "transcript" of the meeting was available through Otter.ai. (Doc. 21-1, ¶ 2.) Unfamiliar with Otter.ai, counsel inquired of Plaintiffs' representative whether he had access to the service and was informed that Defendant had apparently triggered generation of the "transcript" service using a free log-in and that Plaintiffs were able to only access a limited portion of the transcription. (*Id*., ¶¶ 4–5.) Based on that information, Plaintiffs' counsel arranged to obtain the complete "transcript" of the March 30 meeting and a subsequent (April 2) meet and confer session by paying for the Otter.ai service. (*Id*. at ¶ 9.) Some additional bickering between the parties ensued about whether these "transcripts" captured privileged or otherwise confidential discussions. (*See id*., ¶¶ 8–10.) The Court sees no reason to engage in greater depth in the resulting disputes over the "transcript" because: (1) neither party appears to have known enough about Otter.ai to have used it deliberately in an unlawful or improper way; and (2) the Court will not consider the transcript or any arguments based upon those "transcripts" for the simple reason that no party has made any effort to demonstrate its accuracy or trustworthiness. Consequently, Plaintiffs' supplemental reply brief is

stripped of much, but not all, of its substance.

Nonetheless, the Court has endeavored to evaluate whether Plaintiffs have met their burden to establish an OSC is warranted as to each of the points of non-compliance articulated in their initial motion to enforce.[1]

> **A.      No order to show cause is warranted as to compliance with the Court's order to release $653,355 in Versapay account funds.**

In their motion to enforce, filed before the March 18 TRO order reduced the state court's oral ruling to writing, Plaintiffs indicated: "Defendants have not released the $600,000 in Versapay account funds. Those funds remain withheld by Defendants." (Doc. 6 at 12; Doc. 6-1, ¶ 5.) The March 18 TRO Order directed G6 to "immediately comply with all provisions of the State Court TRO, including but not limited to" the directive to "[w]ithin 24 hours of service of this Order, release to Plaintiffs the $653,355 currently held in the Versapay account." (Doc. 10 at 9–10.)

In response to the March 18 TRO Order, Mr. Ladha, who is the Vice President of G6, provided the Court with a declaration that included a lengthy disquisition about how the Versapay platform is not a "'bank account' but is system that reflects credits that can be applied 'on-account' for a franchisee's property." (Doc. 13-1, ¶ 5.) Nonetheless, ultimately, G6 initiated a wire transfer on March 20, sending $653,355 to Plaintiffs. (*Id*., ¶ 6.) Mr. Ladha took pains to assert G6 "has gone beyond the technical limitations of the Versapay system to ensure adherence to the Court's directive" by sending the funds by wire transfer. (*Id*., ¶ 8.) In addition, Mr. Ladha used his declaration to yet again argue that Plaintiffs had a large outstanding balance due to G6, which would otherwise have more than offset the $653,355. (*Id*., ¶ 7.) Of course, this offset theory was presented to the state court as a defense to the TRO request (*see, e.g.*, TRO Tr. at p. 7), but the state court was obviously not moved.

In reply, rather than simply acknowledging that the payment had been made, Plaintiffs point out that the payment was initiated on March 20, 2026, more than 24 hours after the Court

---

[1] The Court has spent an inordinate amount of time attempting to sort through this extremely messy record. The Court has not turned over every stone or read between every line and very well may have misunderstood certain facts or arguments. The parties have only themselves to blame for this.

6

issued its order to release the funds to Plaintiffs. (Doc. 15 at 3.) Though Defendant fails to address the untimeliness of the payment, Plaintiffs do not suggest they were prejudiced in any material way by the brief delay.

In addition, Plaintiffs challenge Mr. Ladha's characterization of the wire transfer as an extraordinary effort to ensure compliance with the TRO.  (Doc. 15 at 3.) Jagesh Patel, a managing member or principal at each of the Plaintiff entities (Doc. 8 at 107, ¶ 1), asserts that G6 routinely uses wire transfers to move funds from Versapay to Plaintiffs. (Doc. 15-1, ¶ 3–4.) This, Plaintiffs assert, "underscores the lack of substance in [G6's] compliance narrative." (Doc. 15 at 3.) Maybe so, but ultimately, G6 has paid the $653,355 it was ordered to release to Plaintiffs. That would seem to be that… Or not.

In its supplemental reply, Plaintiffs for the first time suggest that "the actual Versapay balance for the relevant period was $696,370.69" rather than the $635,355 Plaintiffs asked the Court to order released. (Doc. 18 at 6; *see also* Doc. 6-2 (Plaintiffs' proposed order requesting releasee of "the $653,355 currently held in the Versapay account").) Plaintiffs now contend that G6 owes them an additional $43,015.69. (Doc. 18-2, ¶ 16.) To support his assertion that the "actual Versapay balance for the relevant period was $696,370.69," Mr. Patel references a spreadsheet addressing various months in 2025 and 2026 for hotel properties in California, showing a "Balance owed" of $43,015.69. But he does not cogently explain why this number varied from the original figure of $635,355.[2]

Perhaps more importantly, even assuming Plaintiffs can establish that the Versapay balance was $696,370.69 for the relevant timeframe, the Court is not convinced that Defendant's failure to remit the $43,015.69 shortfall violates the TRO. Plaintiffs are correct that the March 18 TRO order includes preamble that directs G6 to "immediately comply with all provisions of the State Court TRO, **including but not limited to**" the more specific commands articulated in the

---

[2] The two principals, Mr. Patel for Plaintiffs and Mr. Ladha for Defendant, repeatedly reference figures set forth in spreadsheets without bothering to explain how those spreadsheets support their assertions (other than the obvious fact that the spreadsheets contain certain numbers). For the most part, they do not provide documentation supporting the spreadsheets which might, at the very least, explain the import or origin of the figures in those spreadsheets. Where, as is the case here, Plaintiffs bear the burden of showing non-compliance by clear and convincing evidence, they have failed to do so.

numbered list at the end of the March 18 TRO Order. (Doc. 10 at 9-10 (emphasis added).) One of those specific commands was to "[w]ithin 24 hours of service of this Order, release to Plaintiffs the $653,355 currently held in the Versapay account." (*Id*.) Plaintiffs point to nothing in the record (apart from the generic "including but not limited language") that clearly demonstrates Defendant was obligated either by the state court's oral order or the March 18 TRO order to release funds on an emergency basis beyond the $653,355.[3] Thus, the Court cannot find Defendant's refusal to pay the additional $43,015.69 at this time was "not based on a good faith and reasonable interpretation" of the TRO Order. *United Bright*, 596 F.3d at 694. Defendant reasonably concluded that the TRO order meant what it specifically said.

Thus, the request for an OSC Re Contempt is **DENIED** as to this issue.

**B.     An Order to show cause is warranted as to compliance with the Court order to "Release $406,958 in February 2026 OTA reservation proceeds."**

Defendant was also ordered to "[w]ithin 24 hours of service of this Order, release to Plaintiffs the approximately $406,958 in February 2026 OTA reservation proceeds from Plaintiffs' properties." The funds have not been released to Plaintiffs. (Doc. 6 at 12; Doc. 6-1, ¶ 5; Doc. 15-1 at 5; Doc. 18-2, ¶ 18.) It is therefore undisputed that Defendant has not complied with this aspect of the TRO Order, even partially.

In response, Defendant has offered various and confusing explanations for its noncompliance. Initially, G6 claimed that the funds "had not yet been reconciled," and that the reconciliation process would be completed sometime in mid-March 2026, after which time it would become available as credits in Versapay. (Doc. 6 at 85, ¶ 13.) Then, later, G6 appeared to assert impossibility, claiming the "funds have been applied to OTA commission liabilities and remitted to booking.com, Expedia, and/or HotelKey." (Doc. 11, ¶ 29(b); *see also* Doc. 22-1 at 33 ("The Court's Order does not require Defendants to pay amounts that are no longer in their possession or that have already been paid to third Parties. At most, Plaintiffs' position reflects a

---

[3] Of course, Defendant may ultimately be liable for this (or some other) additional amount. But that is not the question before the Court at the TRO stage and thus is not the issue before the Court in this motion to enforce that TRO order. Much of the extraneous debate in the papers appears to arise from the parties" failure to internalize that distinction.

dispute regarding classification, not noncompliance.").) Plaintiffs question the veracity of this latter assertion. (*See* Doc. 15 at 3; Doc. 15-1, ¶ 6 (indicating that the OTA platforms confirmed that reservation proceeds have not been applied against OTA commission liabilities)).) Even assuming G6's characterization of the flow of funds is accurate, even their own description of events suggests they deliberately disbursed funds credited to Plaintiffs' Versapay account to pay off OTA-related liabilities.[4] This is exactly the kind of self-help the TRO Ordered G6 to cease. (*See* Doc. 10 at 11 ("Immediately cease all interception, withholding, or diversion of reservation proceeds from Online Travel Agency platforms.").)

Seeming to recognize its tenuous position on this issue, Defendant has offered to pay the $409,958, should it be ordered to do so:

> Nevertheless, and without conceding Plaintiffs' position, Defendants respectfully request that the Court permit application of the $406,958 toward the amounts already paid on Plaintiffs' behalf. Alternatively, Defendants remain willing to remit such amount should the Court determine that additional payment is required, notwithstanding the prior discharge of those obligations.

(Doc. 22-1, ¶ 34.)

The Court does not find that the March 18 TRO Order is mysterious on this point. It called for the balance in Versapay at the time of the Order (the $635,355) to be released to Plaintiffs and that OTA reservation funds that had not yet been reconciled into Versapay (the $406,958) to also be released. None of Defendant's excuses explain why they failed to do exactly that. Thus, the Court finds that Plaintiffs have met their burden on this issue and will issue the OSC Re Contempt as to this issue. Alternatively, Defendant may purge the potential contempt by remitting the $406,958 to Plaintiffs within 48 hours of this order.

---

[4] In its final sur-reply filed April 13, 2026, Defendant's declarant, Mr. Ladha, indicates G6 has now "completed reconciliation" and "confirmed that a total of approximately $578,310 was paid toward OTA and related obligations on behalf of Plaintiffs' properties" and that "[b]y contrast, Plaintiffs have only contributed approximately $152,000 toward these obligations, with the balance having been satisfied by Defendants." (Doc. 22-1, ¶ 30.) In support of this assertion, Mr. Ladha cites Exhibit F to his declaration, which consists of an incomplete, untitled spreadsheet that appears to cut off key information. (Doc. 22-1) The Court is at a loss what to make of this document and Mr. Ladha provides no further explanation of where the figures contained therein originated, what they mean, or how they support his assertion that G6 cannot comply with the TRO Order. As mentioned above, similar issues abound in this record. Though the rules of evidence do not apply strictly in the context of motions for injunctive relief, both primary declarants (Mr. Patel and Mr. Ladha) provide scant explanation for their accounting assertions. If this situation continues, the Court **WILL** take steps toward the appointment of a Federal Rule of Evidence 706 expert in forensic accounting at the parties' expense.

**C.    No order to show cause is warranted as to the remaining issues.**

    1.    <u>Restoration of Plaintiffs' administrative access to OTA platform accounts</u>

<u>(e.g., Booking.com, Expedia, and similar platforms).</u>

Plaintiffs assert that prior to the dispute at issue in this case, the majority (historically approximately 85–90%) of their reservations came from OTA platforms, as opposed to "Cost Per Direct Booking" reservations. (*See* Doc. 8 at 41, ¶¶ 5–6.) It again appears to be undisputed that Plaintiffs' access to these platforms was removed or restricted after December 2025. (*See* Doc. 11, ¶ 20 (indicating on March 20, 2026 that G6 was in the process of requesting "account access restoration" thereby conceding that access had been interrupted).) The March 18 TRO Order required the following:

> 4. Within 24 hours of service of this Order, relinquish and transfer primary account holder status for all Online Travel Agency platform accounts back to Plaintiffs or Plaintiffs' designated representatives;

(Doc. 10 at 11.)

In response, on March 20, 2026, Mr. Ladha declared that "G6 does not have the unilateral technical ability to restore or transfer primary OTA account holder status" to the third-party independent OTA platforms. (Doc. 11, ¶ 18.) Instead, G6 asserted that it contacted account representatives at Booking.com and Expedia to transmit the Court's order and request expedited processing of the account access restoration. These communications, however, are a parody of what G6 claims they were meant to accomplish. G6's letter to Expedia, for example, states:

> I. BACKGROUND
>
> On or about February 26, 2026, Plaintiffs — a group of Motel 6 and Studio 6 franchisees operating under the collective name "Azure Portfolio" — a**ppear to have potentially obtain [sic] a TRO against G6** in the Superior Court of California, County of Kern (Case No. 26CUB00288). The case has been moved to the Federal Court. Additionally, G6 has filed a Motion to dissolve the TRO before the Federal Court of California on March 13, 2026. On March 18, 2026 Court has ordered G6 to reimburse any funds owed Plaintiffs including OTAs and/or Vendor Platforms.
>
> The TRO enjoins G6 from, among other things:
>
> a) Suspending or terminating Plaintiffs' access to reservation systems, the Hotel Key point-of sale system, and the Freedom Pay credit card payment processing system;

b) Suspending or terminating Plaintiffs' contracts with third-party service providers; and

c) Otherwise interfering with Plaintiffs' ability to accept reservations, process payments, and operate their properties.

II. REQUEST FOR CONFIRMATION

As an outcome of the TRO, **which may be obtained by the Plaintiffs and/or may not been formally intimated or served to G6 to date, and given that the matters remains pending for adjudication**, the Court may expect the below mentioned guidelines and instructions that you may have to follow upon final order. Accordingly, G6 therefore requests that you confirm in writing, within five (5) business days of receipt of this letter, whether you are able and willing to comply with such prospective instructions:

1. Refund the last twelve (12) months of fees, commissions, or charges collected in connection with the Azure Portfolio properties identified below; and

2. Continue providing services to the Azure Portfolio properties at no charge going forward, pending resolution of the litigation and further Court order.

**IV. CONSEQUENCES OF NON-COMPLIANCE**

While we are neither your legal counsel nor asserting to provide you with reliable advisory or counsel, in our view if the order is not complied with, G6 will be required to present your written response to the Court as evidence of impossibility of performance or operational constraint. Such evidence may form the basis for a request to the Court to modify, clarify, or dissolve the TRO as it relates to your services.

G6 does not seek to create any hardship for your organization and appreciates your cooperation in this Court-mandated process. If you have legal counsel, please ask them to contact us directly at your earliest convenience.

(Doc. 11 at 20–21 (emphasis added).) This letter, which is dated March 19, 2026 (i.e., the day after the March 18 TRO issued), leaves the Court wondering many things, the **least** of which is why G6 could not have simply informed Expedia of the **text** of the March 18 TRO order and requested that Plaintiffs access to the platform be restored.

As of March 24, 2026, Mr. Patel asserted that Plaintiffs still lack primary administrative access to any OTA platform, and the OTAs have confirmed that only G6 can make those changes. (Doc. 15-1, ¶ 11; *id*., Ex. H.) For example, Booking.com indicated in communications to Plaintiffs that as to Plaintiffs' "request to update [Plaintiffs'] primary account . . . since this

11

property is a chain, we advise you to please contact your chain manager." (Doc. 15-1 at 61.)

Notwithstanding that the letter above tends to suggest bad faith on G6's part, Plaintiff appears to concede that G6 has since provided primary access to Booking.com and Expedia. (Doc. 18 at 4.) However, primary access has not been transferred for the remaining OTA platforms, including Priceline, Agoda, Super.com, Google, and Airbnb. (*Id.*) Defendant does not dispute this but asserts that it "does not maintain direct contractual or administrative control" over these platforms which "operate through third-party integrations" so Defendant "cannot unilaterally assign or transfer access." (Doc. 22, ¶ 7.) Though the March 18 TRO Order requires Defendant to "relinquish and transfer primary account holder status for <u>all</u> Online Travel Agency platform accounts **<u>back to</u>** Plaintiffs," Defendant points out that the Court's Order also requires Defendant to "ensure that all future reservation proceeds from Online Travel Agency reservations flow directly from the Online Travel Agency platforms to Plaintiffs **pursuant to Plaintiffs' independent contracts with said platforms**." (Doc. 10 at 11 (emphasis added).) Defendant contends that Plaintiffs never had independent contracts with the remaining platforms, so it "cannot restore a relationship that never existed."

Frankly, the Court cannot make heads or tails of this dispute on the existing record. Plaintiffs, who have the initial burden in this motion, do not explain the nature or extent of their pre-existing access to or use of the remaining platforms, and thus do not clearly and convincingly explain how Defendant could comply with the TRO Order as to these platforms. Plaintiffs make the logical argument that they cannot develop independent relationships with these platforms to control listings for G6 branded properties that are simultaneously listed under G6's own contracts with these OTA platforms. (Doc. 18-2, ¶ 9.)[5] Yet absent more specific information, this only serves to underscore that it may be impossible for G6 to hand over to Plaintiffs primary control as to certain OTA platforms. Thus, the Court **DENIES** the request for an OSC on this issue.

        2.    <u>Restoration of Plaintiffs' "Full Access" to Hotel Key point-of-sale system, central reservation systems, and Freedom Pay credit card processing</u>

---

[5] This kind of practical conundrum is exactly the reason why injunctive relief is often not capable of resolving all problems that might arise in a complex business relationship.

system.

According to Plaintiffs, in late December 2025, G6 suspended Plaintiffs' access to three systems critical to Plaintiffs' operations: (1) Hotel Key, a point-of-sale system used to check guests in and out of rooms, process room charges, manage room inventory, and perform all front-desk operations; (2) the central reservation systems, which allow franchisees to receive, view, and manage reservations from all sources; (3) the Freedom Pay credit card payment processing system, which allows franchisees to process guest credit card payments for rooms, incidental charges, and refunds. (Doc. 8 at 45, ¶ 30.) Defendant did not dispute this at the TRO hearing or at any other point. (*See* Doc. 11, ¶ 23–24 (discussing efforts to restore access to these services).)

The state court ordered restoration of these services at the March 5, 2026 hearing, (TRO Tr. at p. 12), and this Court reduced that directive to writing in its March 18 TRO. (Doc. 10 at 10 ("5. Within 24 hours of service of this Order, restore Plaintiffs' full access to Hotel Key point-of-sale system, central reservation systems, and Freedom Pay credit card processing system.").)

G6's Mr. Ladha declared on March 20 that G6 had restored HotelKey to "live and operational" status for Plaintiffs' properties; G6 contacted FreedomPay, an independent credit card processing platform, to request expedited reinstatment; and G6 was in the process of restoring all internal central reservation system access for Plaintiff's properties insofar as doing so "is within G6's direct administrative control."[6] (Doc. 11, ¶ 24.)

Plaintiffs concede that HotelKey access has been restored, (Doc. 15 at 2), and make no obvious arguments/cite no facts demonstrating that they still cannot access FreedomPay and/or the central reservation system. Accordingly, Plaintiffs have not met their burden to demonstrate an OSC is warranted as to this issue and the motion is **DENIED** on this ground.

### 3.    Related "Brand Collect" issues

As the March 18 TRO Order explained, (Doc. 10 at 1–2), Plaintiffs allege that starting in late December 2025, G6 began threatening to and then did engage in coercive business practices, including resorting to a "self-help" mechanism to withhold moneys that should flow to Plaintiffs

---

[6] Mr. Ladha pledged to file a supplemental declaration confirming when that had taken place. (Doc. 11, ¶ 24.) It does not appear that he has done so.

13

via various booking platforms by processing those payments through a service called "Brand Collect." (*Id.*, ¶ 46; *see also* Doc. 4 (describing Brand Collect as a "service that certain companies, like Booking.com and other online travel agents [ ] provide to their users to assure that bills are paid").)

The March 18 TRO directed Defendant to cease this conduct:

> 6.      Immediately cease all interception, withholding, or diversion of reservation proceeds from Online Travel Agency platforms and insure that all future reservation proceeds from Online Travel Agency platform reservations flow directly from the Online Travel Agency platforms to Plaintiffs pursuant to Plaintiffs' independent contracts with said platforms.

(Doc. 10 at 11.)

In his March 20, 2026 declaration, Mr. Ladha indicated:

> G6 has directed its operations and Brand Collect system administrators to cease applying Brand Collect collection mechanisms against Plaintiffs' OTA reservation proceeds including those flowing through Booking.com, Expedia, and HotelKey effective immediately. G6 will not initiate new Brand Collect offsets against Plaintiffs' accounts pending further order of this Court. G6 reserves all rights with respect to the underlying franchise fee obligations and the legitimacy of Brand Collect as a contractual mechanism, but will abide by this Court's directive while it remains in effect. As noted in ¶¶ 17 and 21 above, this cessation will result in G6 paying ongoing OTA and HotelKey commission obligations for Plaintiffs' properties with no collection mechanism until this Court orders Plaintiffs to pay the fees, which G6 preserves for the preliminary injunction hearing.

(Doc. 11, ¶ 26.) Again, that would seem to be that. But, again, Plaintiffs do not concede.

Plaintiffs maintain that G6 has continued to "apply Brand Collect against Plaintiffs' OTA reservation proceeds after the Court's March 18, 2026 Order." (Doc. 15 at 8.) According to Mr. Patel's March 24, 2026 Declaration:

> 17.  Between March 18 and March 23, 2026, G6 intercepted a total of $121,571.31 in OTA reservation proceeds through the Brand Collect mechanism. A true and correct copy of the account records reflecting these continued Brand Collect deductions is available from Plaintiffs' POS system. Because it is 69 pages, I am attaching hereto as Exhibit I a true and accurate copy of a spreadsheet summarizing the Brand Collect charges for reservations booked between March 18 and March 23, 2026, totaling $121.571.31, as referenced above and more fully detailed in the POS report.

14

18.    Between March 10 and 17, 2026 (the period of G6's initial contempt of the State Court Order) and the federal Court's Order enforcing the State Court Order), G6 continued applying Brand Collect on Plaintiffs properties, charging the amount of $132,085.47. A true and correct copy of the account records reflecting these Brand Collect deductions between March 10 and March 17, 2026 is available from Plaintiffs' POS system. Because it is 33 pages, I am attaching hereto as Exhibit J a true and accurate copy of a spreadsheet summarizing the Brand Collect charges for reservations booked between March 10 and March 17, 2026, totaling $132.085.47, as referenced above and more fully detailed in the POS report.

(Doc. 15-1, ¶¶ 17–18.) The referenced spreadsheets, however, are far from clear and convincing.

Exhibit I consists of this spreadsheet with no additional text or explanation:

| Property Name | CPDB Collected from 3/18/26 - 3/23/26 |
|---|---|
| Motel 6 Lebec | $ 9,371.44 |
| Motel 6 Bakersfield Airport | $ 8,206.76 |
| Motel 6 Lost Hills | $ 3,222.67 |
| Studio 6 Buttonwillow | $ 2,060.40 |
| Studio 6 Hemet | $ 5,430.94 |
| Studio 6 Bakersfield | $ 4,435.14 |
| Studio 6 Carpinteria Suites | $ 5,993.31 |
| Motel 6 Monterey | $ 9,882.13 |
| Motel 6 Camarillo | $ 12,193.55 |
| Motel 6 Santa Barbara | $ 19,312.51 |
| Motel 6 Carpinteria North | $ 21,897.55 |
| Motel 6 Carpinteria South | $ 19,564.91 |
| Total CPDB Collected | $ 121,571.31 |

(Doc. 17-1 at 65.) First, rather than referencing OTA revenue, it references "CPDB Collected" and thus facially addresses Cost Per Direct Booking revenue only. The same problem arises with Exhibit J, which also facially reflects only "CPDB" reservation revenue.[7]

The Complaint in this case specifically draws a distinction between CPDB revenue and OTA revenue. (*See* FAC, ¶ 21 ("Plaintiffs rely on both Online Travel Agency [ ] and Cost Per Direct Booking [ ] reservations. OTAs like Booking.com and Expedia provide broad market reach but include higher commission costs. CPDB or Direct Billing reservations are booked directly

---

[7] Mr. Patel's offer to disclose the underlying supporting records related to this spreadsheet (and other, similar tables) is too little too late. Assuming those records indeed support the content of this spreadsheet, they presumably would also pertain to Cost Per Direct Booking reservations. Moreover, this Court is not required to engage in this lengthy record on multiple occasions to ferret out Plaintiffs' factual support.

through hotel websites and retain higher margins by avoiding commissions to an intermediary platform.") Critically, the March 18 TRO focuses on Defendant's processing of OTA revenue and contains very limited instructions related to CPDB:

> 6.    Immediately cease all interception, withholding, or diversion of reservation proceeds from Online Travel Agency platforms and ensure that all future reservation proceeds from Online Travel Agency platform reservations flow directly from the Online Travel Agency platforms to Plaintiffs pursuant to Plaintiffs' independent contracts with said platforms;
>
> 7. Immediately cease charging Plaintiffs duplicative fees consisting of both Online Travel Agency commissions and Cost Per Direct Booking fees for the same reservations.

(Doc. 10 at 11.)

Similarly, Mr. Patel further asserts that "G6 has withheld $918,488.20 in Cost Per Direct Booking [] fees associated with future reservations booked at Plaintiffs' properties between March 23, 2026 and November 30, 2026," (Doc. 15-1, ¶ 19), citing the following spreadsheet presented at Exhibit L:

| CPDB Future Reservation Amounts Collected by G6 Hospitality LLC | | |
|---|---|---|
| Property | CPDB Dates Range | Total Amount |
| TUJHMM INC. Motel 6 Lebec | 03/23/26-11/30/26 | $ 22,913.00 |
| TUMM Hospitality LLC Motel 6 Carpinteria North | 03/23/26-11/30/26 | $ 108,935.03 |
| JHMM Hospitality LLC Motel 6 Carpinteria South | 03/23/26-11/30/26 | $ 213,306.89 |
| HLM Hospitality LLC Studio 6 Bakersfield South | 03/23/26-11/30/26 | $ 16,774.18 |
| Hemet Hospitality LLC Studio 6 Hemet | 03/23/26-11/30/26 | $ 19,536.41 |
| JHMM Hospitality LLC Studio 6 Carpinteria Suites | 03/23/26-11/30/26 | $ 80,551.54 |
| OM SRI RAM Hospitality INC Motel 6 Lost Hills | 03/23/26-11/30/26 | $ 44,387.73 |
| Azure Investment Group LLC Studio 6 Buttonwillow | 03/23/26-11/30/26 | $ 20,886.95 |
| OM SRI SAI Hospitality INC Motel 6 Bakersfield Airport | 03/23/26-11/30/26 | $ 22,900.81 |
| Bayside Hospitality LLC Motel 6 Monterey | 03/23/26-11/30/26 | $ 183,651.70 |
| Santa Barbara Hospitality LLC Motel 6 Santa Barbara | 03/23/26-11/30/26 | $ 122,610.88 |
| Camarillo Hospitality LLC Motel 6 Camarillo | 03/23/26-11/30/26 | $ 62,033.08 |
| | | |
| Total Fees Taken | | $ 918,488.20 |

(Doc. 15-1 at 71.) Plaintiffs argue that these "reservation fees[8] represent revenue from bookings at Plaintiffs' properties that are either being retained by G6 in violation of the Court's Order and

---

[8] The Court notes that the parties do not use the term "fees" with any precision. The spreadsheet attached at Exhibit L (Doc. 15-1 at 69), for example, suggests that almost $1 million in "fees" were "collected" by G6 for reservations within a date range. But the Court cannot tell if the term "fees" is being used here to reference the cost of a reservation or some part of the reservation amount.

must be released to Plaintiffs, or that must be released to Plaintiffs at the time of the reservation in accordance with the Cour Order." (*Id*.) For one thing, this argument seems to concede an obvious problem, which is that Exhibit L references reservations ranging from "03/12/26-11/30/26." The end of this date range is many months in the future. It is not clear how Defendant could be in contempt of Court for failing to disburse revenue that has not yet been realized. Also, as with Exhibits I and J, Exhibit L facially refers only to CPDB revenue. Again, the Court finds no basis for an OSC re contempt in relation to how Defendant processes CPDB reservations.

If it is Plaintiffs' position that the reservations reflected in these spreadsheets are being mis-classified as CPDB, they do not provide evidence demonstrating as much. Nor does the present record demonstrate that Defendant is otherwise misclassifying reservations. Plaintiffs did at one point assert that certain reservations made through the Motel 6 mobile application were being improperly processed as CPDB reservations. (Doc. 8 at 4.) This allegation is not evidence. Plaintiffs' motion to enforce made no mention of the Motel 6 App when raising concerns about processing OTA reservations as CPDB reservations. (*See* Doc. 6 at 8 ("Beginning in mid-December, Defendants implemented an unauthorized 'Brand Collect' billing scheme under which Defendants: a. Unilaterally began processing Plaintiffs' Online Travel Agency (OTA) reservations (from Booking.com, Expedia, and similar platforms) as Cost Per Direct Booking (CPDB) reservations.").) Yet, in its supplemental reply, Plaintiffs confusingly assert that certain actions G6 is taking in relation to "the Motel 6 website and mobile application" violate the TRO's order to cease implementation of "Brand Collect." (Doc. 18 at 10.) Notably, however, Plaintiffs fail to direct the Court's attention to any language in the March 18 TRO Order connecting the concept of Brand Collect to the Motel 6 website or mobile application.[9]

To put all this another way, nothing in the present record supports a finding that Defendant currently is mis-classifying reservations as CPDB so the spreadsheets presented

___

[9] The FAC alleges that the "Brand Collect" self-help system includes "processing G6 App and OTA reservations as CPDB." (Doc. 1-2, ¶ 46.) But in the March 18 TRO Order, the Court defined "Brand Collect" somewhat differently, adopting Defendant's definition, based on a declaration describing it as a "service that certain companies, like Booking.com and other online travel agents [ ] provide to their users to assure that bills are paid." (Doc. 10 at 2.) Plaintiff did not take issue with the Court's adoption of the only facts it possessed about the scope of the term Brand Collect.

concerning CPDB are unhelpful. Nor is the Court convinced it should reservations made through the Motel 6 App to be the same as reservations made through an OTA for purposes of enforcing the TRO.

Plaintiffs make numerous other assertions of noncompliance. To make a long story short, the Court does not find these arguments persuasive. For example, Plaintiffs have failed to provide cogent evidence that Defendant is continuing to charge duplicative fees or that Defendant has withheld or caused to be withheld cancellation or no-show fees from OTA reservations.[10]

Thus, the motion is **DENIED** in all other respects.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, Plaintiffs' motion to enforce (Doc. 6) and for an order to show cause re contempt is **GRANTED IN PART**:

(1)    Defendant is **ORDERED TO SHOW CAUSE IN WRITING** on or before **May 8, 2026** why it should not be held in contempt for failing to comply with this Court's March 18, 2026 order to "[w]ithin 24 hours of service of this Order, release to Plaintiffs the approximately $406,958 in February 2026 OTA reservation proceeds from Plaintiffs' properties."

      a.    Alternatively, Defendant may purge the potential contempt by remitting the $406,958 to Plaintiffs within 48 hours of this order.

      b.    Plaintiffs may file a response to Defendant's written filing on or before **May 15, 2026**.

      c.    Upon review of the papers, the Court will determine whether a hearing is necessary.

(2)    The motion is **DENIED** in all other respects.

(3)    In addition, the state court set a preliminary injunction hearing for May 20, 2026. The Court is unavailable on that date. Its first availability for a hearing, if necessary, is in mid-June 2026. In addition, for the reasons expressed in numerous

---

[10] Relatedly, for the reasons set forth above, Plaintiffs have failed to demonstrate by clear and convincing evidence that Defendant has violated the TRO by improperly processing no show and cancellation fees from the Motel 6 mobile app, because the March 18 TRO does not facially apply to those reservations.

ways above, the Court finds the existing record does not efficiently and effectively present the issues. The Court will therefore require the parties to completely re-brief any issues they wish to present on preliminary injunction. Those briefs shall stand alone and **SHALL NOT** incorporate by reference prior briefs, arguments, declarations, or evidence. As mentioned, depending on the nature and quality of those presentations, the Court may consider the appointment of a Rule 706 Expert.

(4)   The parties are directed to meet and confer in a good faith effort to establish a schedule for briefing any motion for preliminary injunction that addresses the need to extend any ongoing injunctive relief up to and through the conclusion of briefing, any hearing, and the issuance of an order on the motion, keeping in mind that this Court is simultaneously managing one of the largest caseloads in the Nation, including several dozen emergency habeas petitions a week.

(5)   Considering what the Court has learned of this case thus far, the parties are **STRONGLY** encouraged to consider an early settlement conference or mediation. The disputes presented here do not lend themselves easily to resolution by way of injunctive relief and, absent consent to the magistrate judge, this case will experience considerable delays.

IT IS SO ORDERED.

Dated:   **April 24, 2026**

UNITED STATES DISTRICT JUDGE

19